Case: 5:16-cv-02847-SL  Doc #: 20-7  Filed:  02/28/17  1 of 77.  PageID #: 1003

**STATE OF OHIO**
**OFFICE FOR EXCEPTIONAL CHILDREN**

IN THE MATTER OF
DUE PROCESS REQUEST FILED BY:  **IMPARTIAL**
                **HEARING OFFICER**
                **ANNE PIERO SILAGY**

**PETITIONER**          **SE 3168-2015**

v.

**SOLON CITY SCHOOL DISTRICT**
**BOARD OF EDUCATION**

and

**SOLON CITY SCHOOL DISTRICT**
**BOARD OF EDUCATION**

**PETITIONER**          **SE 3156-2015**

v.

             **DECISION**

**APPEARANCES**

| | |
|---|---|
| **DANIEL BACHE** | **KATHYRN PERICO** |
| Roderick, Linton & Belfance | **LISA H. WOLOSZYNEK** |
| 50 South Main Street | Walter Haverfield |
| 10th Floor | The Tower at Erieview |
| Akron, OH  44308 | 1301 E. 9th Street |
| | Suite 3500 |
| | Cleveland, Ohio  44114 |

1

EXHIBIT G

## PROCEDURAL HISTORY

An extensive review of the procedural history is necessary in order to set forth and adequately frame the issues remaining for determination.

On July 21, 2015 the Solon City School District filed a due process complaint requesting a due process hearing in relation to                (hereinafter KM), a student in the Solon City School District who had recently completed her eighth grade year. KM's mother is               (hereinafter Parent). Case number 3156-2015 was assigned to the request by the Ohio Department of Education.

The District's due process complaint asks for a finding that the District's July 9, 2015 ETR was appropriate and a determination on whether the District, because of the propriety of the ETR, appropriately denied the Parent's request for an IEE.

On August 26, 2015, the Parent filed a due process complaint with the Ohio Department of Education alleging that KM is being denied FAPE, has been subject to unwanted bullying and harassment, and that the District has refused to address bullying and harassment problems at school. The complaint further asserts that the District has failed its child find obligations; has failed to protect KM from physical and emotional distress; as well as has attempted to cover up incidents at school. The complaint next claims that the District has retaliated against KM by refusing to conduct a proper MFE; by not providing an IEP; by telling Parent that they had to provide any medical opinions they wanted to be considered at the MFE or the opinions would not be considered; by not seeking medical opinions on their own; by refusing to provide a Section 504 evaluation; and had further retaliated by threatening to seek fees in a Prior Written Notice dated April

2

24, 2015.  Lastly, the Parent's due process complaint contends that the District failed to produce all records as requested in a records request of the Parent and prior to any meeting regarding a potential IEP.  This case was assigned as Case No. 3168-2015 by the Ohio Department of Education.

On September 3, 2015, the District filed a Motion to Consolidate the Due Process Complaints seeking to consolidate Case No. 3156-2015 and 3168-2015.  In addition, the District filed a PR-01 Response to Parent's Due Process Complaint.

On September 9, 2015, the Solon City School District filed a Notice of Insufficiency as it related to Case No. 3168-2015.  Parent did not to respond to the Sufficiency Notice.

By order dated September 14, 2015, this Hearing Officer ruled that Parent had identified several problems, albeit including ones that may not be remediable by the IHO, as well as facts that supported the alleged problems.  This Hearing Officer ruled that while the complaint was sufficient, that the District would have an opportunity to raise its jurisdictional concerns at the upcoming status telephonic status conference or at the Disclosure Conference.  Parent was specifically urged to carefully review her complaint to insure that the issues raised were appropriate for a due process hearing under IDEA.

On September 15, 2015 a telephonic status conference was held wherein the parties' counsel indicated that they desired to further discuss the issues and requested that another telephonic status conference be held prior to any further scheduling. Jason Wallace Esq. appeared on behalf of the Parent and David Hirt Esq. represented the District in the conference call.  Counsel further indicated that a joint extension of time

3

would be submitted to the IHO by September 18, 2015 to allow for mediation and settlement discussions.  A further telephonic status conference was scheduled for October 6, 2015 and an Order Scheduling Further Status Conference notifying the parties of the status conference was issued by this IHO on September 16, 2015.

On September 21, 2015, Parent filed a Motion to Stay and Request for Extension stating that she agreed to a consolidation of the matters relating to the ETR/MFE but desired an IEE for the remaining issues raised in her complaint.  Parent requested an extension of time for all matters not consolidated and requested that the deadline for decision for those remaining issues be extended to April 1, 2016.

On September 21, 2015 Parent also filed her Response to Motion to Consolidate indicating that she had only dismissed a prior complaint SE 3095-2015 in an effort to obtain an IEE.[1]  Parent reiterated that she did not object to consolidating any issues relating to the MFE/ETR itself.

On September 21, 2015 Parent also filed a Motion to Recuse requesting that the Hearing Officer recuse herself indicating that Parent's Counsel had filed a "similar brief in an unrelated matter".[2]  Parent alleged that this IHO had been retained privately by District Counsel on behalf of a different school for other matters thus creating a perceived or actual conflict for the IHO to hear the present matter. The sole support attached to the motion were emails referencing that this IHO had agreed to conduct a Section 504 hearing under the ADA for another school district, although that matter did not go forward nor was the IHO ever retained.  The Parent requested an oral hearing.

---

[1] The previous due process complaint, Case No. 2015 SE 3095, was filed on April 15, 2015 and dismissed by this IHO pursuant to Parent's request on June 26, 2015.  District Ex. 5.
[2] Parent did not identify the other matter nor was there any attachment provided.

4

On September 22, 2015, the IHO emailed Parent's counsel with a copy to District counsel and inquired as to what "unrelated matter" Parent's counsel was referring to in the Motion to Recuse and suggested that the Motion to Recuse be supplemented.

On September 22, 2015, the District filed a Motion to Extend the Deadline by Which a Hearing Must Be Held and Decision Rendered seeking an extension until December 7, 2015 in which to render a decision stating that contrary to representations during the telephonic conference call, Parent's attorney never responded to the District's proposed joint motion and order that had been submitted to Parent's counsel on September 16, 2015.

On September 23, 2015 the District filed a Response to Petitioner's Opposition to Consolidation of Matters.

On September 25, 2015, the District submitted Board's Opposition to Petitioner's Motion to Recuse.

Parent never supplemented the Motion to Recuse and on September 28, 2015 this IHO issued an order denying the Motion to Recuse finding no basis to the Parent's request.

By order dated September 29, 2015 this IHO consolidated the cases stating that the Parent could file a Motion to Bifurcate Issues if needed. In addition, by separate order of the same date, this IHO ruled that since both parties were desirous of an extension that an extension would be granted until December 7, 2015 and that if Parent wished to bifurcate the issues, she must specify in the a motion to bifurcate the precise issues she believed should be presented at any subsequent hearings as well as a proposed timeline.

5

On October 6, 2015, a telephone conference call was held. Attorney Daniel Bache handled the conference call on behalf of the Parent and Attorney Kathy Perrico participated on behalf of the District. At that time, Parent was given until October 20, 2015 to submit a proposed list of issues to be presented at the hearing(s) in the matter and directed that the Parent should set forth the issues with specificity and shall identify which of those issues the Parent requests bifurcated and the reasons therefore. The District was given until November 4, 2015 in which to respond and the Parent was provided until November 14, 2015 in which to reply. An order setting forth the timelines was issued on the same date.

In addition, during the October 6, 2015 telephone conference call, the parties agreed to hold the Disclosure Conference on December 7, 2015 at 10:00 am. Hearing dates of January 6, 7, 27, 28 and 29, 2016 were approved by Attorney Bache and Attorney Perrico, as well as an extension of the deadline to render a decision to March 11, 2016. On the same date this IHO issued her standard Scheduling Order setting forth the dates and deadlines as well at setting forth certain housekeeping rules and requirements for the submission and exchange of exhibits.

The October 6, 2015 Scheduling Order specifically directed that witness lists and exhibits were to be exchanged at the Disclosure Conference. The order further directed that all exhibits were to be pre-marked and contain a table of contents. Copies were to be provided to opposing counsel.

6

By Joint Motion dated October 7, 2015 the parties requested an extension of the deadline in which to render a decision to March 11, 2016 and by Order dated October 8, 2016 the deadline was extended to that date.

On October 20, 2015, Parent filed a List of Proposed Issues and Motion to Bifurcate setting forth the following seven issues:

1. Was KM denied FAPE under IDEA and 504?

2. Was KM subjected to unwanted bullying and harassment?

3. Did the District unlawfully retaliate against KM in violation of IDEA or 504?

4. Did the District violate its child find obligations under IDEA and 504?

5. Did the District fail to provide access to all educational records prior to any meeting relating to any potential IEP or outside of required timelines?

6. Was the District's Multi-Factored Evaluation (MFE) a proper evaluation and did it encompass all of KM's areas of need?

7. Was the District's denial of an Independent Educational Evaluation (IEE) proper?

The Parent requested that Issues 1, 2, 3 and 4 be bifurcated and that Issues 5, 6 and 7 be heard prior to Issues 1, 2, 3 and 4. Parent also stated that she needed an IEE to contest the MFE.

On November 4, 2015 the District submitted Board of Education's Motion to Dismiss with Memorandum in Support.

No reply to the Motion to Dismiss was filed on behalf of the Parent other than a November 5, 2015 email from Attorney Wallace which stated "The Petitioner will not

7

respond to this motion designed to simply increase attorneys' fees and attempt to unreasonably protract the final resolution of this controversy. There is no such mechanism as a 'Motion to Dismiss' in a Due Process Hearing authorized under federal law or the OAC. Instead the only thing authorized is a sufficiency challenge, which the Respondent has already asserted and failed to prevail on. Therefore, the Petitioner will not respond to this 'Motion'."

On December 2, 2015, this IHO ruled that she clearly no jurisdiction over Section 504 claims. The order further directed that since the student had not been identified under IDEA as having a disability nor did she have an IEP, that the IHO was without jurisdiction to hear any independent claims relating to bully and/or harassment. Finding no basis under IDEA for a claim of retaliation and that the Parent had not provided any authority for the same, the order dismissed the Issue No. 4. The order further found that while the complaint stated only that the District had failed to *produce* records as opposed to *access* to records, since the identification of issues presented on October 20, 2015 included the statement that she had been denied *access* to records, Issue No. 5 could proceed.

As to Issue No. 6, this IHO found it was very broad and did not state with specificity how the MFE was deficient nor did it identify what areas of need were not covered as directed by the IHO in the October 6, 2015 order. Despite this, this IHO declined to dismiss for failure to comply with the IHO's orders as requested by the District. Concluding that the IHO had jurisdiction to hear Issue No. 7, the IHO concluded that Issues No. 2 and 4 were not within her jurisdiction and dismissed those claims. As to the remaining issues this IHO found that Parent had yet to obtain an IEE and had

8

indicated that she had no intention of obtaining one on her own, and was instead relying on prevailing on the merits of her claims to obtain an IEE, and therefore there was no reason to bifurcate the matter.

In the December 2, 2015 order, the Hearing Officer specifically directed the Parent to file at the Disclosure Conference an Amended List of Issues to be addressed to include the following information: How specifically was the student denied FAPE? How and when the District violate its child find obligations? When were requests made by the Parent to provide access to educational records and when was access denied and to what records were access denied to?  Finally Parent was directed to specifically identify how the MFE was improper and in what areas of the student's needs did it not encompass.

On December 2, 2016, Parent submitted Petitioner's Witness List containing a list of 40 proposed witnesses.

By email dated Thursday, December 3, 2015 at 9:03 pm, Parent's counsel requested a continuance of the Disclosure Conference that was set for Monday, December 7, 2015, and by email dated December 3, 2015 at 9:27 pm, the District opposed the request.  By order dated December 4, 2015, this IHO denied the request for continuance indicating Parent could renew her request on the record at the Disclosure Conference and directed counsel to be prepared to address the issues raised on the record at the Disclosure Conference.

On late Sunday evening on December 6, 2015, Parent filed Petitioner's Motion in Support of Jurisdiction Regarding Retaliation as well as a Motion to Shift Burden of

Production to District. In addition, Parent submitted a Motion for Sanctions for Frivolous Conduct complaining that the District belatedly produced documents to Parent.

On December 7, 2015, the Disclosure Conference was held. At the Disclosure Conference, the IHO issued a Protective Order regarding the confidentiality of test protocols and directed they be provided to Parent's counsel no later than December 8, 2015 at 5:00 pm. Disclosure Conf. Tr. 33-34.

At the Disclosure Conference the District requested the Hearing Officer issue subpoenas for the attendance of KM's medical providers at the hearing. These medical providers were on the District's witness list as well as the Parent's. Parent's counsel stated that, although they were on her witness list, Parent would possibly not be calling the medical providers themselves as witnesses but still wanted to utilize certain medical records as evidence. Parent further objected to the subpoenas requiring medical providers to produce records at the hearing. Disclosure Conf. Tr. 83-106.

The Hearing Officer ruled that the School District had a right to call the medical providers as witnesses and that a refusal to allow the School District to call those witnesses and at the same time allow the Parents to use medical records from those providers would impede the School District's right to cross-examination under Ohio Administrative Code Section 3301-51-05(K)(11).. The Hearing Officer noted that any records produced by the subpoenaed witnesses would be produced first at the hearing and would be reviewed by the Hearing Officer prior to inspection by the District to alleviate the Parent's professed concerns over relevancy and privacy. The Hearing Officer executed the testimonial subpoenas that requested the medical providers appear at the

10

hearing with KM's medical records. The District was instructed not to serve the subpoenas if the Parent revised her witness list prior to December 21, 2015 to exclude those witnesses. Disclosure Conf. Tr. 86-106.

Since KM was on Parent's Witness List, the IHO signed a subpoena to compel her testimony at hearing. Parent's counsel was advised that the subpoena would not be served if District Counsel was notified on or before December 21, 2015 at 5:00 pm that KM would not be testifying. Parent's Disclosure Conf. Tr. 164-165.

At the Disclosure Conference, over the objection of the District, the Hearing Officer granted the Parent's request for additional time to prepare her exhibit book and modify her witness list, if needed, to exclude the medical providers at issue and directed that the Parent do so no later than December 21, 2015 at 5:00 p.m. or the District would be allowed to subpoena those providers as witnesses at the hearing. Disclosure Conf. Tr. 23, 34, 93.

Parent's Counsel was further granted until December 21, 2015 at 5:00 p.m. to identify any documents not produced. Disclosure Conf. Tr. 34.

Parent's counsel stated that the Parent did not have an IEE, and that the reason Parent did not have one was because she could not afford one. Disclosure Conf. Tr. 77-80.

On December 8, 2015 at 2:57 pm, District Counsel emailed a protected file containing the test protocols to Parent's Counsel.

11

On December 16, 2015 the Board filed a Memorandum in Opposition to Parent's Motion in Support of Jurisdiction Regarding Retaliation as well as a Board of Education's Memorandum In Opposition to Parent's Motion for Sanctions and an Oral Hearing.

Parent submitted an Amended Witness List on December 21, 2015 which added ten names and now totaled 50. Parent did not delete KM or any of the medical providers from her list. The District then issued the previously executed subpoenas to the medical providers and to KM for attendance at the hearing.

By email dated December 15, 2015 at 10:33 p.m., Attorney Wallace raised objections to the IHO's rulings and requested that Parent be allowed to submit exhibits electronically or in the alternative produce only one copy at the hearing. Second the email requested that the deadline for submission of exhibits and issues be extended until 5 days prior to the commencement of the hearing. The email also asked that the issues as outlined already be allowed to stand and that no further clarification of the issues be required. Fourth the email requested that all issues be addressed on the record to eliminate confusion and to prevent "contamination" of the "real issues". Lastly, the Parent requested that additional hearing dates be added and /or for the IHO to reconsider her ruling on the motion to bifurcate. Several emails were then exchanged between Parent's counsel and District counsel regarding the propriety of the email request. District Counsel opposed the Request by email dated December 16, 2015 at 5:50 a.m.

On December 21, 2015 the IHO issued an order granting Parent until December 28, 2015 at noon in which to submit her Exhibit book to the District. The order denied

12

the Parent's request to exchange the documents in electronic form unless the District agreed in writing to the request.  Parent was directed to comply with all other orders or directives established at the Disclosure Conference specifically including the timeline for providing an updated statement clarifying the issues.  The IHO further ruled that in order to protect the integrity of the record all further requests were to be in written motion form.

On December 21, 2015, the District submitted Board of Education's Motion to Vacate Order Re:  Email Request for Extension.

On December 21, 2015, the Parent requested the issuance of approximately 38 subpoenas for appearance at the hearing.  The IHO executed the subpoenas and returned them to counsel on the same date.

On December 22, 2015 a Board of Education's Motion to Compel Clarification of Issues was submitted.  The District noted that the Parent had failed to comply with the IHO's order at the Disclosure Conference directing the Parent to clarify issues.  The District further alerted the IHO that Parent had not notified the District that KM was not testifying by the December 21, 2015 5:00 pm deadline and that since KM still remained on Parent's witness list, it intended on serving the subpoena that had been issued at the Disclosure Conference.

A Board of Education's Motion to Quash Subpoenas was submitted on December 22, 2015 requesting the IHO quash subpoenas issued to certain witnesses.

On December 23, 2015, the District filed District's Exhibit List.

On December 24, 2015 Parent filed a List of Proposed Issues (2). The issues were identified as follows:

1. Was KM, a student that the District denied an IEP and 504 plan denied FAPE under IDEA and 504?

   a. If so, when and how?

2. Was KM subjected to unwanted bullying and harassment"

   a. If so, when and how?

3. Did the District violate its child find obligation under IDEA and 504?

   a. If so, when and how?

4. Did the District unlawfully retaliate against KM in violation of IDEA or 504?

   a. If so, when and how?

5. Did the District fail to provide access to all educational records prior to any meeting relating to a potential IEP or outside of required timelines?

6. Did the District fail to provide the Parent the opportunity for meaningful input and participation?

   a. If so, when and how?

7. Was the District's Multi-Factored Evaluation (MFE)/Evaluation Team Report (ETR) done in 2015 proper?

   a. Including but not limited to :

      i.  Did the MFE/ETR have a predetermined outcome?

      ii. Was the "team" biased?

      iii. Did it encompass all of KM's needs?

14

iv. Did the "team" properly consider KM's health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities?

v. Should the "team" have offered a medical evaluation?

vi. Should the "team" have offered a mental health evaluation?

vii. Did the "team" fail to consider the bullying KM endured?

viii. Did the "team" fail to consider the effects of the multiple concussions that KM received?

ix. Did the "team" consider all of the relevant data and information?

x. Were the teacher reports correct?

xi. Should the "team" have included people who were more familiar with KM?

xii. Did the "team" properly consider KM's decline in grades?

xiii. Did the "team" properly consider KM's increase in absences or tardies?

xiv. Did the "team" properly consider the parent's input?

xv. Did the school produce all of KM's records prior to the team meeting?

xvi. Did the "team" properly refuse to consider KM's medical diagnosis and medication she was taking?

xvii. Did the "team" reach the right result in refusing to provide KM and IEP or 504 plan?

xviii. Should the "team" have considered KM's asthma?

15

xix.    Should the "team" have considered how many times KM went to the nurse, school counselor, social worker etc.?

xx.    Should the "team" have considered KM's work avoidance that developed after numerous concussions?

xxi.    Should the "team" have considered the doctors notes the school had in its possession?

8.    Was the District's denial of an Independent Educational Evaluation (IEE) proper?

On December 28, 2015, the District and the IHO both received boxes containing the Parent's Exhibits totaling over 3500 pages. They were compiled into rubber banded groupings of 8 exhibits and were not in a book or binder. They were identified as follows:

1. Documents produced by Petitioner (        ) (PETI-268)

2. Recordings Produced by Petitioner (       ) (PET268a)

3. Untimely documents produced by Respondent (School District), emailed 6/7/15 (PET 269-360)

4. Very untimely documents produced by Respondent (School District), emailed 11/19/15 (PET361-860)

5. Super untimely documents produced by Respondent (School District), emailed 11/30/15 (PET861-2717)

6. Respondent's Binder Exhibits (PET2718-3260)

7. Respondent's Disclosure of Educational Records (PE3261-3397)

16

8. Respondent's Supplemental Exhibits and Amended Exhibit List (PET3398-3665)

The IHO's exhibits have been retained in the same box and in the same condition as received from Parent's counsel.

By letter dated December 28, 2015, Parent provided a CD with audio recordings to the IHO.

On December 29, 2015, the District filed a Motion in Opposition to Petitioner's Motion to Produce Witnesses or Alternatively, Witness Addresses.

By order dated December 29, 2015 this IHO found that there was no independent claim for retaliation under IDEA but that conduct that could be described as retaliatory that affects or impedes rights under IDEA may be used as evidence to the extent that there was a nexus between the complained of conduct and the MFE and/or child find obligations.

After the District's testimonial subpoenas executed at the Disclosure Conference were issued, the District advised the Hearing Officer and Parent's counsel that the subpoenaed witnesses had alerted the District that they would not be complying with the subpoenas without medical releases executed by the Parent. On December 30, 2015 the Board filed a Motion to Compel Execution of Release of Limit Introduction of Evidence. Citing OAC 3301-51-05(K)(12)(c) the District asserted that the IHO had authority to issue subpoenas when relevant, necessary and material, but that without execution of releases so that the medical providers to testify and provide requested documents, the subpoenas issued by the IHO were meaningless. The District complained that the

17

Parent's exhibits contained multiple medical records and that without the ability to authentic or inquire of the authors as to the interpretation of those records would be highly prejudicial to the District. In the alternative, the District asked for the first time on December 28, 2015 that the medical records disclosed for the first time on December 28, 2015 be barred.[3]

On January 2, 2016, Parent filed an Objection to All Prehearing Motions and Orders arguing that IHO's only have limited power and thus IHO's could not change the five day disclosure rule by requiring the exchange of exhibits at a disclosure conference; require a party to submit any writings; order an exhibit list or tabs be used; order paper copies of disclosures; order binders to be used or provided to anyone; order prehearing statements; require motions in pleading form; hear or seek any motion prior to the hearing; or issue any order unrelated to the dates and times of the due process hearing or disclosure conference. Parents argued that due process hearings are intended to be informal and easily accessible and any form of motion practice has a chilling effect and would silence parents and prevent them from being able to enforce their rights. The Parent further argued that the IHO had no ability to allow for post hearing briefs and the decision had to be reached *in* hearing.

A Notice of Intent to Seek Reimbursement of Costs was filed by the Parents on January 2, 2016 stating that the Parent intended on seeking reimbursement from the District for the cost of photocopying, placing the exhibits into binders and mailing their exhibits. Parent stated in the Notice that since she was mandated to produce copies

---

[3] The evaluations the District requested be stricken all predated the December 28, 2015 disclosure by months and in some cases more than a year; i.e. Neurophysical Evaluation dated May 27, 2015, Child Guidance Assessment dated November 4, 2014 and Psychiatric Evaluation dated December 3, 2014.

pursuant to the order of the IHO, the cost would fall unto the School District for the "amount of money it has taken to comply with the Orders of this Hearing Officer".

On January 4, 2016, the Parent filed a request for continuance of the hearing dates or in the alternative that the Parent be able to question the School District witnesses and the end of the School District's case in chief and during the presentation of her case in chief. Parent's counsel complained that he had not yet received from the School District the order of witnesses to be testifying and since counsel was to be in a different hearing for the next two days, he would not be able to adequately prepare.[4] Counsel also notified the IHO that the Parent would not be present for the first two days of the scheduled hearing. On the same date, the IHO issued an order directing the parties to disclose no later than 3:00 pm on the day prior to any hearing date a list of witnesses and the anticipated proposed order of their testimony for the following date and denied the request to be permitted to delay cross examination of witnesses as well as the request for continuance. The IHO deferred the Parent's request that she not be called to testify until later in the hearing until the commencement of the hearing.

On January 4, 2016, the District filed a Motion in Opposition to Parent's Notice Regarding Costs maintaining that fees and costs could only be recovered by a prevailing party under IDEA. The following day, the District filed a Motion to Strike All Email Submissions after December 21, 2015 as being in violation of the IHO's directives. In addition the District submitted a Motion in Opposition to the Parent's Objections to All Prehearing Motions.

---

[4]  In the Motion, Parent's Counsel commented that there was no scheduling of witnesses at the Disclosure Conference.  Counsel omits that he had requested time to amend his witness list due to his schedule and was given an additional two weeks to finalize his witness list.  Parent amended on December 21, 2015 to add ten witnesses.

19

On January 4, 2016, the District submitted Proposed Stipulations to Parent's Counsel for review by email.

On January 4, 2016, Parent's Counsel replied they would be able to agree to Stipulation 9 and possibly others with some "tweaks".

At 2:56 pm on the day prior to the commencement of the hearing, Mr. Wallace notified the IHO and opposing counsel that he "may be getting ordered to appear for hearing" in the Summit County Court of Common Pleas. When the IHO responded that she would therefore expect co-counsel, Mr. Bache, to be present, Attorney Wallace advised that Mr. Bache would be covering at least three other hearings for Mr. Wallace and had other hearings of his own. Counsel was then advised to put the request in writing and provide whatever documentation they had to support their request. Mr. Wallace then advised that since the Common Pleas Court hearing was scheduled for 12:45 pm that he would likely need to leave Solon by 11:00 am. The District responded that it would serve little purpose to hold a hearing for two hours and requested a teleconference at 10:00 am instead to discuss how to proceed and obtain additional hearing dates.

The IHO issued an Order at 5:33 pm cancelling the hearing for January 6, 2016 and directed that the District arrange for a teleconference on January 6, 2016 at 10:00 am and that Parent's counsel submit in writing the reasons for both lead counsel and co-counsel's unavailability for the hearing including any supporting documentation.

At 10:27 pm on January 5, 2016 Mr. Wallace then advised the IHO and District Counsel for the first time by email that he was required to attend a "previously scheduled meeting" at 10:00 am and thus would not be able to participate in a telephone conference at that time.

On January 6, 2016, after repeated efforts were made to reach Mr. Wallace, a telephone conference was held starting at 11:15 am.   Based upon the teleconference, the IHO issued an order granting the Parent's counsel to provide any further documentation to support their unavailability to attend the hearing and information regarding the 10:00 am meeting by 5:00 pm, and granted the District until January 13, 2016 to respond or file a Motion for Sanctions.

During the January 6, 2016 telephone conference, Parent's Counsel advised that they had now prepared an Exhibit Book and had eliminated some of the documents. Concerned because she had prepared using the 8 exhibits submitted, District Counsel objected and in order to allow District counsel to inspect the Exhibit Book prior to hearing, the January 7, 2016 hearing date was also cancelled and additional hearing dates of February 10 and 19, 2016 were added.

The IHO's order also directed that Parent be present at the commencement of the hearing on January 27, 2016. The order further granted the District's Motion to Compel Execution of Releases or to Limit Introduction of Evidence and asked that an order be submitted and that such order specify that Parent execute a release by a date certain or the introduction of certain medical records would be disallowed.

The January 6, 2016 order further advised Parent's counsel and Parent that the failure to abide the Hearing Officer's orders, show disrespect to the IHO and or opposing counsel or other conduct to be frivolous misleading or unnecessarily causing a delay in the proceeding may result in sanctions.

On January 6, 2016, the IHO granted the District's Motion to Strike All Email Submissions after December 21, 2015.

On January 6, 2016, Parent's counsel submitted a Notice in response to the IHO's request for documentation of the conflicts. The Notice provided no record of when Attorney Wallace first learned of the conflict other than to state it was scheduled in "late" December 2015. No explanation as to why Counsel did not alert the IHO or opposing counsel was proffered. Attorney Wallace also stated he would be withdrawing because his representation may bias his client "due to the previously raised perception of conflict or bias."

On January 7, 2016 the District filed a Motion Requesting Permission to Ask for Correction of Disclosure Conference Transcript.

On Friday, January 8, 2016, Parent requested execution of 49 Revised Subpoenas, including outside medical providers. The IHO executed the Subpoenas and returned them on the same date.

On January 8, 2016, this IHO issued an Order Re: Motion to Compel Execution of Releases directing execution of releases for the subpoenaed medical and therapeutic providers by January 15, 2015 at 3:00 pm or parent would be barred from using records relating to that provider.[5]

On January 10, 2016, the District filed a Motion in Opposition to Petitioner's Motion to Produce Witnesses or Alternatively, Witness Addresses.

On January 11, 2016, Parent filed a Motion to Clarify this IHO's Order of January 8, 2016 and asked that the releases be limited to two years and concerns over revocation of the releases.

---

[5] The year 2015 was a clerical error and should have stated 2016.

22

On January 13, 2016, the District filed a Motion for Sanctions with supporting documents and affidavits.

On January 14, 2016 at 10:55 am, an Order Clarifying the issues relating to the releases that the Parent was to execute and permitting the substitution of certain language contained in the releases.[6]

On January 15, 2016, the District filed a Notice of Parent's Non-Compliance of the IHO's order of January 8, 2016 to execute the releases and requested that the IHO prohibit the use of, reference to, any records from any outside provider, including but not limited to medical or psychological records related to the corresponding provider, exhibits or otherwise, at the due process hearing.

On January 15, 2016 Parent filed an Objection to Order Re: Motion to Compel Execution of Releases dated January 8, 2016.

On January 15, 2016 the District filed a revised Exhibit List to add 4 additional exhibits.

On January 19, 2016 Parent filed an Objection to District's Motion Requesting Permission To Ask For Correction of Disclosure Transcript and the District responded on January 20, 2016.

On January 19, 2016, the District filed a Notice of Intent to Introduce Exhibits and Submitted a revised Witness List. The additional exhibits included KM's recently issued 9th grade report card, as well as records provided by Parent on December 28, 2016,

---

[6] The Order is dated January 6, 2016, but was in fact issued on January 14, 2016.

a neuropsychological evaluation and audio recordings of the EIR Planning meeting and ETR meetings.

On January 20, 2016 the District also filed a Motion in Opposition to Parent's Objection to Order Re: Motion to Compel Execution of Release dated January 8, 2016 noting that another due process hearing on January 14, 2016 had to be cancelled at the request of Mr. Wallace and Mr. Bache due to a scheduling conflict and noted that Parent still had not executed any releases, despite the IHO's order granting Parent the ability to revise certain language in the releases.

On January 22, 2016 this IHO ruled that under OAC Section 3301-51-05(K)(12)(c)(ii) the service of subpoenas was the sole responsibility of the party requesting the subpoena and shall not be assumed by the Hearing Officer.  The IHO ruled that the requested relief to require the District to provide the attendance of witnesses or provide residential addresses forth witnesses could not be granted.

On January 22, 2016 the District filed a Notice of Invalid Service of Parent's Subpoenas alerting Parent's Counsel that the District did not consider the subpoenas delivered to the District's secretary for service as proper service for certain witnesses.

On January 24, 2016 Parent filed a Notice of Withdrawal of Motion for Sanctions stating that she no longer believed the IHO had authority to issue sanctions.

On January 25, 2016 Attorney Kristopher Immel entered an appearance on behalf of the Parent as co-counsel with Daniel Bache. Other than by reference in the January 6, 2016 Notice, no formal withdrawal has been filed by Attorney Wallace.

24

As of January 26, 2016 Parent had refused to execute releases required by medical providers in order to allow the School District to call upon cross examination those medical providers at the hearing. Those same providers had prepared evaluations, reports and/or opinions that the Parent wanted to use as evidence in this matter.

On January 26, 2016 at 9:13 pm, the evening prior to the rescheduled start of the hearing, the Hearing Officer received via email notification that the Parent had appealed the Hearing Officer's Orders. The document entitled "Opposition to District's Motion for Sanctions" asserts the Parent had no choice but to file the appeal since the IHO had not ruled on the Objection to Order Re: Motion to Clarify.

On January 26, 2016, the Hearing Officer ruled that there was no mechanism for a party to appeal of an order issued in the due process complaint relating to the conduction of the hearing that did not render a final ruling on the merits of the case. Finding no authority for an appeal of an order in this matter and further finding that the SLRO has the ability in any appeal of the final decision in the matter to allow additional evidence if the Parent is dissatisfied with the Hearing Officer's rulings as it relates to the evidence, the Hearing Officer concluded that this matter should not be stayed and the hearing would go forward.[7]

At the start of the hearing, the Hearing Officer read the January 6, 2016 order to Parent who acknowledged that she was aware of its terms.

---

[7] The IHO also noted that the hearing was a five day hearing in which the District was scheduled to proceed first. The objections raised in the latest objection were restatement of the objections raised at the Disclosure Conference, in its prior response to a motion to compel, as well as the telephone conference of January 6, 2016. The IHO stated that pending motions would be addressed at the commencement of the hearing.

Prior to the start of testimony, over the objection of the School District, the Hearing Officer inquired as to the Parent's current position as to the execution of medical releases so that medical providers could testify and medical records could be used. After allowing Parent time to consult with current counsel as well as Mr. Wallace by telephone, the Parent refused to execute releases without certain restrictions. The Hearing Officer then again ordered that the Parent would not be permitted to use medical records relating to those providers finding that it would limit the District's ability to cross-examine the author of those documents. Tr. 39-69.

In addition, this IHO overruled Parent's Motion Objecting to All Hearing Motions. This IHO also advised Parent that the issue that KM was denied FAPE was too broad and would not go forward, and after discussion narrowed the issues to child find, denial of meaningful parental input, access to records and the appropriateness of the MFE. Tr. 8-11.

The IHO again clarified that she had no jurisdiction over any retaliation claim but if the conduct impacted child find it could be relevant.  Tr. 12-13.

The Motion to Correct Disclosure Conference Transcript was granted after review of the recording by the court reporter. Tr. 74.

On February 1, 2016, Kristopher Immel filed a Notice of Withdrawal of Counsel stating he was withdrawing as counsel.

On February 9, 2016 the District filed a Motion for Continuance of the February 10, 2016 hearing date due to illness of the District's final witness and of Parent's counsel. The IHO issued an order dated February 10, 2016 cancelling that hearing date and

26

scheduling an 11:00 am telephone conference on February 10, 2016 to select a new date. A telephone conference was held and an order scheduling a final hearing date of February 26, 2016 was issued.

During the pendency of the hearing, Parent's Counsel served the District with a public information request seeking documents regarding the retention of this IHO and payment of fees to this IHO in any matter at any time. Hearing Ex. 1.

On February 17, 2016, the District filed a Motion in Limine advising the IHO that the Parent intended on calling one of the medical providers, Laurel Greene, as a witness. At the hearing, the IHO sustained the Motion again reminding Parent and her Counsel that she had elected not to sign the releases.

During the hearing, the parties requested an extension of the deadline in which to render a decision in order to allow for the preparation of the transcript and filing of post-hearing briefs. The parties agreed to submit their briefs no later than April 8, 2016 and to extend the deadline in which to render a decision until April 29, 2016. By order dated February 22, 2016 the Hearing Officer issued an order codifying that request.

By email dated, the District requested clarification of the order as to the time of day in which the briefs would be due. Finding no time was set forth in the February 22, 2016 Order, or in the transcript, the Hearing Officer replied that the parties could have until midnight on April 8, 2016 in which to submit their briefs.

By email dated April 7, 2016, the District requested that they be permitted to file their brief ex parte and that the Hearing Officer provide copies to counsel once both briefs had been submitted. The Hearing Officer agreed by email dated April 8, 2016

27

indicating that she would be out of the office all day and that she would email copies of the briefs once they had been filed to counsel.

On April 8, 2016 at 3:47pm the District submitted it's brief. At 11:59 pm, the Parent submitted her brief. Copies of the briefs were submitted to each party were forwarded to the parties by the Hearing Officer by email dated April 10, 2016.

## FINDINGS OF FACT

**Background Information**

1. (hereinafter KM) is a fifteen year old student with a date of birth of October 16, 2000. KM's mother is (hereinafter Parent). District Ex. 1, p. 4.

2. KM has lived with her mother in the Solon City School District since Kindergarten. Tr. 1401-1402.

3. KM was enrolled in the Solon City School District as a seventh grade student during the 2013-2014 school year and as an eighth grade student during the 2014-2015 school year. District Ex. 21, p. 92-96; Tr. 65; District Ex. 9 p. 37A.

4. KM is an exceptional athlete and has participated in soccer and volleyball for both her school and for private club teams. Tr. 1516-1517.

**The First Concussion**

5. On September 18, 2013, KM was struck in the head by a locker door. She was kneeling by her locker when another student slammed the door shut. Tr. 326-328, 1403-1406, 1418.

6. The school district investigated the incident and found no evidence that the conduct was intentional. District Ex. 52.

7. KM's mother filed a police report regarding the incident. No action was taken by the Solon City Police Department. Parent Ex. 9. Tr. 1406.

8. KM was absent for three days as a result of the concussion, and then resumed normal activity for the remainder of her seventh grade year. The District was provided a doctor's note confirming her concussion and the recommendation that she be provided extra time to catch up on homework and tests. District Ex. 9, p. 37B, Ex. 26 p. 151. Tr. 326-328, 1418.

9. KM played volleyball for the District's seventh grade team as well as for a private club league during the 2013-2014 school year. KM participated in the Conference Tournament as well as played for her entire club volleyball season with the exception of sitting out in March 2014 when she suffered another "concussion". Tr. 1516-1517.

**The Second "Concussion"**

10. In March 2014, during a club volleyball activity, KM allegedly suffered a second concussion. Tr. 1413.

11. At that time, the Parent did not notify the District of the second "concussion". Tr. 334.

12. Parent did email her choir teacher that she was missing a concert due to her noise sensitivity. Tr. 1416.

13. Parent did not disclose this "concussion" on the OHSAA form completed in order for KM to participate in athletics at the school the following year. The August 1, 2014

29

form reports a 10/2015 concussion, and stated she had been "restricted from playing sports for 1 week." Ex. 27, p 155.

14. No medical evidence was produced at the hearing evidencing a medical diagnosis of a concussion at the time of the concussion.

**The "Third" Concussion**

15. During the 2014-2015 school year, KM was enrolled in the District as an eighth grade student. Tr. 651, District Ex. 9. P 37A, Exhibit 22, p. 96

16. On October 1, 2014, during volleyball practice for the District's team, KM was struck in the head by a volleyball. KM informed her coach that she was fine and continued practice without complaint. District Ex. 35, p. 238.

17. On October 8, 2014 KM was seen by Dr. Michelle Burke, a pediatric neurologist with Akron Children's' Hospital. Dr. Burke diagnosed KM with a mild brain injury (concussion) and recommended restrictions both in school and extra-curricular activities. Tr. 428-429, District Ex. 29, p. 168-169

18. Dr. Burke recommended that KM attend half days of school until October 13, 2014, no tests for one week, untimed tests, extra time to turn in assignments, reduced workload when possible, and consideration of reduced make-up work, nod access to rest or the nurse's office if symptoms worsened during school. District Ex. 29, p. 168-169.

19. Parent notified the District of the concussion on October 6, 2014 and October 8, 2014. Tr. 336, 427-428, District Ex. 9, p. 37B. Exhibit 28, p. 167. Exhibit 29, p. 168-169, Exhibit 35, p. 238. The District was advised that KM should not return to PE class or sports on November 13, 2015. District Ex. 31 p. 171.

30

20. Kelly Amstutz, the Solon Middle School Counselor, notified teachers and other District personnel, of the concussion as well as the restrictions and accommodations and made adjustments to KM's schedule to accommodate the temporary half day limitations. Tr. 428, 470-471, 525-527, 805, 886-888, 1572-3, District Ex. 35, p. 230, 236.

21. KM returned to school full time on October 16, 2014.  Tr. 430, District Ex. 35, p. 240.

22. KM was cleared to participate in volleyball in November 2014 and participated in her club volleyball team as early as December 2014. Tr. 1521-1522

23. Parent described her daughter as a little depressed and overwhelmed at this time. Tr. 1525, Ex. 19, p. 145

24. On July 28, 2015, KM and Parent completed an OHSAA form in order for her to compete in athletics for the District.  The form simply states KM "had restrictions after concussion".  District Ex. 27, p. 161.

**Bullying**

25. During 2014-2015, KM experienced issues with another student and was targeted on Instagram.  Tr. 1455-1457, Parent Ex. 19 p. 306-307, 352.  This student was not in her French class.  Parent Ex. 19 p. 306-307.  Tr. 1187-1188.

**Academic Performance Prior to Eighth Grade**

26. In the Ohio Achievement Test given in 6th grade, KM scored 423 or proficient in reading and 474 or advanced in math.  District Ex. 9 p. 37A.

31

27. In the Ohio Achievement Test given in 7th grade, KM scored 432 or "accelerated" in reading and 462 or "advanced" in math. District Ex. 9, p. 37AB.

28. KM's seventh grade grades were as follows:

| Subject Area | 1st | 2nd | 3rd | 4th | Final |
|---|---|---|---|---|---|
| Social Studies | B | B- | D | B- | C+ |
| Phys. Ed | 0 | 0 | 0 | 0 | 0 |
| Mathematics | B | B | A- | A- | A- |
| Science | B | C | C+ | B- | C+ |
| English/LA | B | B- | B+ | B | B |
| Art | 0 | | 0 | | 0 |
| Chorus | A+ | A+ | A+ | A+ | A+ |
| French | B+ | A- | C+ | B- | B |
| Digital Art | | 0 | | 0 | 0 |

Her GPA was 3.273.  Tr. 1264, District Ex. 21.

**Absences**

29. During the 2014-2015 school year, KM was absent from school 6.5 days in the first quarter, 7.5 days in the second quarter, 8.5 days in the third quarter, and 4.5 days in the fourth quarter.  District Ex. 22, p. 96.  Some of these absences were related to KM's participation in club volleyball.  Tr. 1072.

30. On April 7, 2015, the Solon City School District issued a letter to the Parent stating that as of March 27, 2015 that KM had at least seven days of parent excused absences.  After ten days of parent excused absences, the District requires a doctor's note for the absence to be excused.  Parent absences may be changed to a doctor's excused absence with the submission of a doctor's note. Tr. 1518-1519,  Ex. 34, p. 203

**Eighth Grade Academic Performance**

31. During the 2014-2015 school year, KM was assigned to Mr. Brashear's classroom for eighth grade science during the fourth period. KM was assigned to Mr. Richardson's class for health and physical education class during sixth period and to Ms. Berkley's eighth grade math class during seventh period. KM was assigned to Ms. Gale's science class during fifth period and Ms. Clark's English/language arts class during the eighth period. Mr. Richardson was also her study hall monitor. Tr. 461, 498, 515, District Ex. 22, p. 97.

32. Mr. Brashear is a graduate of Kent State University and holds a Bachelor's degree in comprehensive social studies and a Master's degree in curriculum and instruction. Mr. Brashear is the holder of a license issued by the State of Ohio Department of Education certifying him to teach eighth grade social studies. Tr. 226-228, District Ex. 44, p. 447.

33. Mr. Richardson is a graduate of Youngstown State University and holds a Bachelor's degree in education. Mr. Richardson is a holder of a license issued by the State of Ohio Department of Education certifying him to teach K-12 physical education and 7-12 health. Tr. 459-461, District Ex. 44, p. 455.

34. Ms. Berkley is a graduate of Ballwin Wallace University and holds a Bachelor's degree in mathematics with an emphasis in computer science and education. Ms. Berkley received a Master's degree in Mathematics from The Ohio State University. Ms. Berkley is the holder of a permanent license issued by the State of Ohio Department of Education certifying her to teach in mathematics and data processing in grades 7-12. Tr. 507-509, District Ex. 44. P. 445.

33

35. Ms. Gale is a graduate of Miami University of Ohio and holds a Bachelor's degree in education as well as a Master's degree in education for middle school science and mathematics from John Carroll University. Ms. Gale is the holder of a license issued by the State of Ohio Department of Education certifying her to teach math and science in grades 4-9 and holds a reading endorsement for grades K-12. Tr. 784-785, District Ex. 44, p. 451.

36. Ms. Clark is a graduate of the University of Akron and holds a Bachelor's degree in German and English and a Master's degree in education from John Carroll University. She also holds an additional 30 credit hours beyond her Master's degree. Ms. Clark is the holder of a license issued by the State of Ohio Department of Education certifying her to teach English grades 7-12 with a reading endorsement. Tr. 857-859, District Ex. 44, p. 449.

37. Ms. Boumitri holds a Bachelor's degree in teaching and a Bachelor's degree in Engineering from France and Lebanaon. Ms. Boumitri is the holder of a license issued by the State of Ohio Department of Education certifying her to teach French. Tr. 1175, 1203, District Ex. 44, p. 446.

38. Rachel Vidd is a graduate of Notre Dame College and holds a Bachelor's degree in education and a secondary in Social Studies education. She holds a mild to moderate intervention Specialist license from Notre Dame College and a Master's Degree in curriculum and instruction from Ashland University. Ms. Vidd is the holder of a license issued by the Ohio Department of Education certifying her to teach integrated social studies and work as an intervention specialist. Tr. 1219-1220, 1233-1234, District Ex. 44, p. 457.

39. Ms. Vidd works as a tutor in the ARC and uses some of her skills as an Intervention Specialist while working with KM including organization skills, study skills, time management and self advocacy with teachers. Tr. 1221.

40. Mr. Brashear believed KM is a very pleasant student and is attentive, cooperative and easy to work with. He found her interactions with her peers to be socially appropriate. Tr. 231, 238, 270.

41. Mr. Richardson described KM as happy and fun in his class. KM interacted well with him and her peers. He did notice frustration when she was not allowed to participate in physical education class because of her concussion. Tr. 466-468.

42. Ms. Gale found KM to be hard-working and happy. KM interacted with Ms. Gale and her peers appropriately. KM participated in class, provided correct answers and quick to take redirection. Tr. 788-789.

43. Ms. Clark found KM to be socially appropriate in her class and polite. KM was able to focus and get on task and independently initiate and complete assignments. Tr.869, 871-872, 876-877.

44. In French class with Ms. Boumitri, KM participated, worked appropriately with groups, sustained attention to task and did not present any behavior concerns. Tr.1204-1209.

45. Solon Middle School students are given work ethic and attitude scores in each class for each quarter. The scores range from 1 to 4, with 4 being the highest. KM's scores during the 2014-2015 school year are summarized below:

| Subject Area | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| Social Studies | 3 | 3 | 3 | 2 |

35

| | | | | |
|---|---|---|---|---|
| Health | 4 | 4 | 4 | 4 |
| Mathematics | 4 | 2 | 3 | 4 |
| Science | 3 | 3 | 3 | 3 |
| English/LA | 3 | 3 | 3 | 3 |
| French | 4 | 4 | 4 | 4 |

District Ex. 22

46. In Mathematics KM's work ethic attitude score dropped because KM continued to not turn in homework. Her score improved over the 3rd and 4th quarters and she demonstrated effort to keep up and understand the material.  Tr. 518-519, 522.

47. In Social Studies, KM's score dropped to a 2 because she failed to turn in her work. Tr. 236-237.

48. KM's grades for the 2014-2015 school year are were as follows:

| Subject Area | 1st | 2nd | 3rd | 4th | Final |
|---|---|---|---|---|---|
| Social Studies | B | C | C+ | C | C+ |
| Health | A | B | B | A- | B+ |
| Mathematics | C+ | D | D | D | D+ |
| Science | C+ | D | C | C- | C- |
| English/LA | B | C- | D | B- | C |
| French | C | C | C | B | C |
| Family & Con. Sc. | | | A- | A- | A- |

49. Grades are weighted so that tests account for 80% of a student's grade and homework counts for 20%.  Her GPA was 2.3275.  Tr. 108-111, 1108-1264.  District Ex. 9, p. 45, Ex. 22, p. 96.

50. KM's teachers worked with KM to catch up on missing assignments as they would do with all of their students.  (Brashear Tr. 232-234, 249); (Berkley Tr. 520-521); (Gale Tr. 802-804); (Clark Tr. 890-894) (Boumitri Tr. 1178-1181)

36

51. Between the 2013-2014 school years, the eighth curriculum for language arts, math and science changed dramatically due to the shift to common core. Rigor increased and, as a whole, student grades decreased and more students were placed into the pyramid. Tr. 860-866, 907-908, 790-792.

52. The jump from seventh grade to eighth grade math was substantial. In math, there was not only an increase in the number of students entering the pyramid, but also an increase in the number of students having to retake the course during summer school. Tr. 510-511, 790-792.

53. KM had missing assignments of 3 in the first quarter, 16 in the second quarter, 8 in the third quarter and 5 in the fourth quarter. District Ex. 9, p. 45.

54. During the 2013-2014 school year, 90% of the 7th grade students earned an A in science, but only 30% of those same students earned an A in science during the 2014-2015 school year.

55. KM was placed into the pyramid for language arts during the 2014-2015 school year. After a brief stay, she responded well to the regular education intervention and moved out of the pyramid. Tr. 878-883, District Ex. 22, p. 115, Exhibit 42, p. 432-434.??

56. KM was placed into the pyramid in math class and improved utilizing the interventions and moved out of the pyramid. Tr. 511-512,

57. KM was not placed in the pyramid in social studies, science, French, health or physical education. Tr. 298-299

58. KM never complained about noise or light levels in her classes or labs and never asked to leave class to see the school nurse with the exception of once or twice in Ms.

Boumitri's class. Tr. 292, 306, 469-471, 500-504 ? 526-527, 567,583??, 795, 806-807,839? 1176-1177.

59. Several of KM's teachers have worked with students with disabilities throughout their careers and are familiar with the process for identifying students with disabilities. (Brashear Tr. 229-230; Berkley Tr. 512-515; Gale Tr. 783-787; Clark Tr. 866-869)

60. The District administered the PARCC test to eighth grade students in the Spring of 2015. KM scored 747, accelerated in science; 766, level 4 (meeting or exceeding expectations) in mathematics; 753 and level 4 (meeting or exceeding expectations) in english anguage arts/literacy performance. District Ex. 24, p. 145-150.

61. At Solon High School, an Academic Resource Center, commonly referred as ARC, is available for students. The ARC is a guided study hall to assist students with assignments, test prep, assigning peer tutors or setting students up with academic labs. Tr. 1215-1216.

62. KM was assigned to ARC during her ninth grade year and as of the date of the hearing was being transitioned to regular study hall. Tr. 1241-1242.

**ETR Planning Meeting**

63. Cari Root is a graduate of Kent State University and holds a Bachelor's Degree in Psychology and a Master's degree in education with an additional 30 hours of coursework to attain an Educational Specialist's degree. Ms. Root is the holder of a license issued by the State of Ohio Department of Education in Pupil Services which permits her to practice school psychology. Tr. 935-936, District Ex. 44, p. 456.

64. Ms. Root is the School Psychologist at the Solon Middle School and oversees special education services in the building. Ms. Root is responsible for facilitating and

38

conducting evaluations for students who are suspected as having a disability. Ms. Root participates in IEP meetings and assists with the development of academic and behavioral plans for student. Ms. Root attends the pyramid meetings for language arts and math. She is also responsible for conducting threat and suicide assessment when needed. Tr. 936-937.

65. The Solon City School District publishes information on its website regarding Child Find and the District's responsibility to seek out and conduct evaluations. It is also made known to parents through related publications on the website and in the local newspapers. Tr. 80-81, 938-939, District Ex. 41, p. 430-431.

66. The Solon City School District has developed a pyramid system to systematically monitor student progress and to provide a means to intervene when a student shows a weakness in the classroom. Tr. 82-84, 939-940, 1079-1081, District Ex. 42, p. 434-437. Parent requests for evaluation, articulated teacher concerns, and or through the pyramid process are all ways in which the District locates children that may be eligible under IDEA. District employees are all trained to ensure that staff members are familiar with the process and are able to assist parents. The District also has a parent mentor that can act as an advocate for parents. Tr. 81-90,937-940, District Ex. 41, p. 430-431

67. On or about April 15, 2015, the District received a due process complaint submitted by the Parent. Tr. 94. District Ex. 5.

68. At no time prior to the filing of the first due process request did Ms. Root or any other Solon City School District teacher suspect that KM had a disability. Tr. 942-943

69. The District interpreted the first due process request as a request for evaluation of KM. Prior to the receipt of the first due process request; no one on the ETR team had independently suspected KM as having a disability. Tr. 941-942

70. Ms. Root made several attempts to contact KM mother to schedule an ETR planning meeting; by email on April 23rd, a follow-up email on April 24th, a telephone conference on April 28th as well as another email on the 28th as a follow-up to the telephone conference. Tr. 943-944, Ex. 12, District Ex 36, pg. 402.

71. On or about May 7, 2016 the District issued a Prior Written Notice to the Parent. District Ex. 12

72. On May 20, 2015 the District emailed a Parent Invitation for the ETR planning meeting to the Parent. The parties agreed to hold the ETR planning meeting by telephone. Tr. 947-948; District Ex.16, p. 80-81.

73. Present at the ETR planning meeting were the regular education teacher, Susan Berkley, the intervention specialist, Emily Winograd, Ms. Root, Principal Eugenia Green, and District counsel. Present by telephone were the Parent and her counsel, Jason Wallace. Tr. 948-949.

74. Parent did not request for any additional people to attend the planning meeting nor did she object to any of the individuals invited to the meeting. Tr. 949

75. Parent recorded the ETR planning meeting. This was done without the knowledge or consent of the District. Tr. 322-323, 957

76. At the ETR planning meeting, Parent represented that KM had been diagnosed with anxiety, depression and PTSD and that she had troubles focusing.

77. During the planning meeting, the team listened to Parent's concerns, discussed suspected areas of disability and explained each of those suspected areas to Parent and her counsel. The team reviewed the planning form in order to discuss and select the planned assessments given the suspected areas of disability. Tr. 361-378; 952-964, District Ex. 57.

78. Based upon the discussion, the parties agreed that the three areas of suspected disability were traumatic brain injury, emotional disturbance and other health impairment. Tr. 952-953, Ex.8.

79. Parent and her counsel deferred to the District to determine the method of intelligence assessment. The parties agreed that the WISC-V would be used as it had specific information that would be useful to determine working memory and processing speed which would the areas one would be expected to see a drop-off or weakness from any long term effects of a concussion. Neither Parent or her counsel expressed any concerns or disagreement over the use of the WISC-V. Tr. 954-957.

80. To measure academic skills, the District identified that it would be using the Woodcock-Johnson Skills of Achievement, Fourth Edition. No objection to the use of the Woodcock Johnson was lodged by Parent or her counsel. Tr. 361-378, 1099-1100.

81. At no time during the ETR planning meeting did Parent or her counsel express any concerns that any of the proposed assessments had a bias towards biracial children. Tr. 958.

82. In the area of Classroom-Based Evaluations and Progress in the General Curriculum, the planning team determined to use the data from her work samples. Tr. 959.

41

83. For social and emotional assessments, the team determined that use of the BASC would be advantageous as it contained a teacher component, a parent component as well as a student component and would provide a well-rounded picture. Neither the Parent nor her counsel objected to the use of the BASC or asked that the rating scales be given to any particular individual. Tr. 961.

84. The team determined that classroom observation in the school setting would be important component of the ETR for student who might have a traumatic brain injury or who was struggling with processing speed or working memory. Ms. Root was identified as the person who would conduct the observation. Tr. 962.

85. The ETR planning team determined that based upon available information and the three areas of suspected disability that no assessments were needed in the areas of speech and language, fine motor, gross motor or vision or hearing. Tr. 960-961.

86. The Parent inquired as to whether there was anything that could be done to improve KM's grades. Ms. Berkley and Ms. Winograd responded with suggestions including completed unfinished assignments. Tr. 973

87. Based upon Mr. Wallace's representation at the ETR meeting that KM was having some suicidal ideations, the District offered to conduct a suicide assessment. Neither the Parent nor counsel agreed or requested that such an assessment be performed. Tr.1037

88. At the ETR planning meeting, the District requested that the Parent provide documentation of the medical diagnoses of anxiety, depression and PTSD and indicated that they only had documentation as to two concussions and requested documentation as to the other two alleged concussions. Mr. Wallace stated that they

would be provided and requested an email reminder be sent to him to provide the information. Tr. 963-964.

89. On May 21, 2015, Ms. Root sent the Prior Written Notice, the ETR planning form and Consent for Evaluation by email to the Parent. The email further stated "Please provide medical documentation for KM concussions and her reported diagnoses of anxiety, depression and post-traumatic stress disorder." Tr. 965, Ex. 8 pg. 30-31.

90. At the time, Parent did not advise the District that any outside testing was being done. Tr. 967.

91. Having not received a response to her email of May 21, 2015 and the school year rapidly coming to a close due to an eighth grade scheduled trip, Ms. Root reached out to the Parent by telephone and followed up with another email on May 27, 2015. Tr. 968-969.

92. On May 28, 2015, the District received the signed consent to proceed with the evaluation. Tr. 970-971, District Ex. 8, pg. 33-34.

**ETR**

93. Ms. Root observed KM in her language arts class. Ms. Root chose language arts due to the rigor of the curriculum as well as its academic structure. KM was on task working with another student. Tr. 975-976, District Ex. 9.

94. Ms. Root also observed KM in the lunch room and noticed nothing atypical an observed KM socializing and interacting with six or seven peers. Her interactions were appropriate and typical Tr. 974-975, 1035

43

95. Based upon her observations, Ms. Root did not identify any needs and felt that her progress could be monitored in the same way and in the same intervals as her regular education peers. Tr. 1035-1036

96. The WISC-V was administered to assess general intelligence and although a full scale IQ score can be obtained by administering the first seven subtests, KM was administered an additional three subtests to obtain information on working memory and processing speed. Tr. 980-981.

97. The test was administered in standardized order and KM was focused and cooperative throughout the test. Tr. 987-988.

98. The WISC-V was properly administered by Ms. Root. District Ex. 9.

99. KM scored average to high average skills in all areas on the WISC-V. In working memory, KM score fell with the average range with a standard score of 103. In processing speed her score was 1116, which fell in the high average range. KM's scores were not consistent with a student suffering from any post-concussive symptoms. Tr. 999-1000.

100. Based upon the WISC-V, no need for accommodations or modifications to the regular education curriculum was established. The WISC-V results demonstrated that KM had the capabilities of progressing within the general education curriculum without modifications and that her progress could be measured in the same way and in the same intervals as her regular education peers. Tr. 998-999. Ex. 9.

101. The Woodcock Johnson Achievement Test was administered to KM to assess academic achievement. The Woodcock Johnson is a comprehensive test, is

administered one on one and provides information specific to reading, writing, and mathematics.  Tr. 1001-1002.

102.  KM was cooperative, focused and attentive during the Woodcock Johnson Achievement Test which was administered by an intern working under Ms. Root's supervision. Tr. 1001-1003.

103.  The Woodcock Johnson Achievement Test was properly administered and KM scores in the average to high average range on every subtest.  The results were consistent in all academic areas and demonstrated no weaknesses in regards to her basic skills, the application of those skills or her fluency in those skills. Tr. 1008-1009, District Ex. 9,  pg. 41-44.

104.  The Woodcock Johnson Achievement Test demonstrated KM had the academic skills necessary to progress in the regular education curriculum and demonstrated no need for special education interventions or accommodations. Tr. 1010-1011, District Ex. 9, p. 41-44.

105.  For social skills, the BASC was administered.  Three teachers who had worked with KM throughout the entire year were selected to complete the teacher assessments. Mr. Brashear, her social studies teacher; Barbara Clark, her language arts teacher and Susan Berkley, her math teacher.   District Ex. 10 pg. 635-636, 637-638, and 639-640.

106.  All of the teachers' reports showed valid and acceptable response patterns. Ms. Clarks' BASC and Mr. Brashear's BASC showed all areas fell within acceptable ranges and no areas either in the clinically significant range or the at risk range. Ms. Berkley's report revealed all areas fell within the acceptable ranges with the

45

exception of social adaptive skills which fell in the at risk range.  Tr. 1023-1024, District Ex. 9  681-696,697-712, 713-728,

107.  The Parent also completed the parent assessment on the BASC and demonstrated no areas which fell in the clinically significant range.  Two areas fell within the at risk range indicating the possible need for additional support.  These two areas that fell within the anxiety, depression, atypicality and attention problems.  Tr. 1020-1021, Ex. 10, pg 647-664.

108.  KM completed the BASC student assessment which revealed no areas in the clinically significantly range and a couple of areas in the at risk range.  The areas in the at risk range were areas of attention seeking and attention problems.  Tr. 1022-1023, District Ex. 10, pg 666-680

109.  The BASC results for KM and her mother showed no areas in the clinically significant range.  The at risk range is 60-70.  Of those scores reported by KM and her mother showed three scores at 60, one at 61 and two at over 65 – attention problems and depression, both of which were on the Parent's report.  Tr. 1026.

110.  Ms. Root performed a semi-structured interview with KM.  Tr. 1026-1028, District Ex. 9, p. 48-49.

111.  Based upon the semi structured results, Ms. Root determined that although there were some at risk categories, neither the teachers nor classroom observation indicated any significant need for specific structured intervention targeting any area of concern.  Ms. Root determined that regular education supports available for students within the regular education classroom, such as the pyramid, guidance counselor and state counselor, could address any needs.  Tr. 1028-1029.

112.    The Social Advocates for Youth program is program through Bellfaire and is available to students at the Solon Middle School for emotional support for students and works with families to provide links to outside resources. Tr. 1030, District Ex. 45 p. 758-763

113.    During her eighth grade year, KM entered into the pyramid in language arts and math at Level 1, the lowest level of intensity. The corrective instruction provided is not specifically designed instruction.

**Access to Records/Records Production**

114.    Parent had access to KM's grades, absences, and assignment records twenty four hours per day, seven days a week through Power School. Tr. 238-239, 797-798, 894-896.

115.    On or about April 15, 2015, a Request for Release of "School Records" by Attorney Wallace was sent to the Middle School. The letter included a Release under Mr. Wallace's law firm's letterhead and was signed by Parent on April 8, 2015. The Release had an expiration date of 60 days from the date of signature. District Ex. 5, and 36, p. 400-401.

116.    On or about May 8, 2015, the District received a Public Records Request from Attorney Wallace. The Request states "Please disregard the one you received previously and refer only to this Request dated May 7, 2015." District Ex. 36, p. 403.410.

117.    On or about July 5, 2015, the District supplied Parent with a copy of the Student's cumulative file. The District understood the school record request to mean the cumulative file. Tr. 203.

47

118. By letter dated July 13, 2015, Attorney Wallace advised that they were seeking complete distribution of KKM's educational records and expressed concerns about missing information. District Ex. 36, p. 411-412.

119. By email dated July 17, 2015, Attorney Perrico advised Attorney Wallace that the District would be unable to comply with the request until a valid release for records was provided stating that the previous release expired on June 8, 2015. District Ex. 36, p. 413.

120. By letter dated September 29, 2015, Attorney Wallace provided an Authorization for Release of Information signed by the Parent on September 24, 2015. District Ex. 36, p. 414-416.

121. On November 19, 2015 a disc of additional records was provided to Parent's counsel, and additional records were submitted by letter dated November 30, 2015. District Ex. 36, p. 757.

122. At no time did Parent request to review records or ask any meetings to be rescheduled due to lack of records. Tr. 205.

**ETR Meeting**

123. A PR-02 was issued by Ms. Root on June 24, 2015 indicating the meeting would be held on July 9, 2015. A second PR-02 was issued by Ms. Root on indicating that the meeting would be held on July 9, 2015 changing the time from 9:00 am to 1:00 pm. A third PR-02 was issued on June 30, 2015 adding Board counsel to the list of attendees as the Parent had indicated that her counsel, Jason Wallace would be present. Tr. 409-413, 1036-1040, District Ex. 35, p. 360-364, District Ex. 17, 18 and 19.

124. An ETR meeting was held on July 9, 2015 at the District's offices. Present at the meeting were the Parent, Attorney Wallace, Ms. Gale (regular education teacher), Mr. Hatteberg (principal/district representative), Ms. Root (school psychologist), Ms. Winograd (intervention specialist) and Board counsel, Lindsay Gingo and Kathy Perrico. Tr.415-417, 1038, 1040; District Ex. 17, 18, 19, Ex. 9 p. 57, Ex. 11; Stipulation Tr. 33.

125. Unbeknownst to the District team members and its counsel, Attorney Wallace recorded the ETR meeting. Tr. 1285, 1286-1381; District Ex. 15, 58.

126. At the ETR meeting, District personnel reviewed all of the ETR results with the Parent and Mr. Wallace. Tr. 1044-1048, 1286-1381, District Ex. 9, Ex. 58.

127. All of the District team members concluded that based upon the information and data gathered that KM was not eligible for special education services. The team concluded that KM did not qualify for special education services and did not meet the eligibility criteria based upon the data provided through the evaluation. Tr. 1044, 1049 Ex. 9, p. 56-57.

128. On the ETR report, the District indicated that it had documentation of two concussions, one in September 2013 and one in October 2014. The District did not receive any other medical information from the Parent that had been requested at the ETR Planning Meeting. District Ex. 9, p. 53.

129. At that point a disagreement arose between Mr. Wallace and the District regarding the provision of medical information. Mr. Wallace indicated he would allow the District to look at a document or documents that referenced a medical

diagnosis, but refused to share a copy of any document or the name of the provider or other specifics. Tr. 1043-1044

130.    If the District had been provided with information from a medical provider regarding a diagnosis of anxiety, depression or PTSD, it would not have changed Ms. Root's opinion that KM was not eligible for special education services because the assessments revealed there was no demonstrated need for unique and intensive specifically designed instruction and KM has demonstrated that with additional regular education supports she was able to succeed. Tr. 1050-1051.

131.    At the ETR meeting, neither the Parent nor her counsel expressed or identified any portion of the ETR that they felt was inappropriate or that any additional assessments were necessary. Tr. 1046.

At the conclusion of the ETR meeting, all of the District team members expressed their opinion that based upon the data and information, that they did not believe KM was eligible for special education services. Tr. 1044-1045

132.    The District did offer that KM participate in the Academic Resource Center at the high school. ARC is a support at the high school that is available to regular education students who may struggle with organization or completion of assignments. Tr. 1052-1053

133.    The Parent and her counsel disagreed with the District's conclusions and Mr. Wallace requested an IEE.

134.    On July 20, 2015 the District issued a Prior Written Notice to the Parent summarizing the results of the ETR meeting. Tr. 1051-1052, Ex. 15.

50

135.    On July 21, 2015, the District filed the within due process complaint seeking a finding that its evaluation was appropriate and that it had properly denied Parent's Request for an IEE.  District Ex. 3.

136.    By letter dated July 31, 2015, Parent responded signed by Attorney Bache. Attached was a one page document with no author stating diagnoses of anxiety, depressive disorder, adjustment disorder and referenced three concussions and asthma.  District Ex. 4.

137.    On August 26, 2015, the Parent filed a due process complaint alleging multiple problems.  District Ex. 1.

138.    On August 26, 2015, the District filed a PR01 in Response.  District Ex. 2.

## LAW AND ANALYSIS

### PARENT'S OBJECTION TO ALL PREHEARING MOTIONS AND ORDERS

On January 2, 2016, Parent filed an Objection to All Prehearing Motions and Orders.  The essence of this objection is that the hearing officer has only limited authority and unless that authority is specifically set forth in the Ohio Administrative Code and/or the Hearing Officer Manual, then any action, motion, procedure or order that have been "created" by the IHO in this matter are not authorized.  The Objection sets for a litany of horrors that the hearing officer imposed on the parties:  preparing an exhibit book, ordering exhibit lists or tabs to be used, requiring paper disclosures, requiring submissions in motion form or on paper and issuing orders unrelated to the date and the time of the hearing.

The objection further protests that this IHO has to hear any claims she brings under "*any* federal law relating to a child with a disability" and therefore this IHO had no authority to dismiss any of her claims – i.e. Section 504 claims, retaliation claims and bullying claims[8]; that the IHO could not extend the time for rendering a decision for the submission of post-hearing briefs[9]; that a decision had to be reached *in* hearing; and that all of this conduct showed bias and lack of impartiality and gave notice to this IHO and the District that she was not waiving any rights to an impartial hearing officer. This objection was overruled at the hearing, the IHO stating that the reasons therefore would be set forth in this decision.

Ohio Administrative Code sets forth the procedural safeguards afforded to parties and grants both the parents and the school district of residence involved in the dispute the right to an impartial due process hearing. *See*, Ohio Administrative Code Section 3301-51-05(K)(10).  Ohio Administrative Code Section 3301-51-05(K)(11)(a) sets forth the hearing rights afforded to *both* parties:

> (a) General
> Any party to a hearing conducted pursuant to paragraphs (K)(2) and (K)(7) to (K)(13) of this rule or paragraphs (K)(20) to (K)(24) of this rule, or an appeal conducted pursuant to paragraph (K)(14) of this rule, has the right to:
>
> (i) Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;
>
> (ii) Present evidence and confront, cross-examine, and compel the attendance of witnesses;

---

[8] The IHO found that while evidence of bullying or retaliatory conduct may be relevant for purposes of the claim relating to child find or the appropriateness of the MFE, no independent claim for bullying or retaliation existed under IDEA.

[9] At no time prior to the filing of the Objection did Parent indicate that she opposed the filing of post-hearing briefs. All extensions had been granted at the behest of both parties.

52

(iii) Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing;

(iv) Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and

(v) Obtain written, or, at the option of the parents, electronic findings of fact and decisions.

The Administrative Code also provides for the additional disclosure of information as a right under Ohio Administrative Code Section 3301-51-05(K)(11)(b) and remedies for failure to comply:

(b) Additional disclosure of information

(i) At least five business days prior to a hearing conducted pursuant to paragraph (K)(10)(a) of this rule, each party must disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing.

(ii) A hearing officer may bar any party that fails to comply with paragraph (K)(11)(b)(i) of this rule from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

Furthermore, Ohio Administrative Code Section 3301-51-05(K)(12) sets forth the responsibilities of the hearing officer and provides:

The impartial hearing officer has the responsibility of conducting the hearing in accordance with the requirements set forth by the office of exceptional children, *including, but not limited to*:

(a) Notifying all parties of the date, time and location of the hearing;

(b) Arranging a disclosure conference *at least* five business days prior to the hearing to assure that information to be presented at the hearing is disclosed;

(c) Issuing a subpoena or a subpoena duces tecum when relevant, necessary, and material, with fees and mileage paid by the party requesting the subpoena;

(i) Either party may request subpoenas to compel the attendance of witnesses at the hearing. Either party may request subpoenas duces tecum to compel the

53

witnesses to bring specified documents to the hearing. Requests for subpoenas duces tecum are submitted to the hearing officer. The hearing officer signs the subpoenas.

(ii) A subpoena may be served by an attorney at law, or by any person who is not a party and over the age of eighteen. Service of a subpoena upon a person named therein shall be made by delivering a copy of the subpoena to the person, by reading it to him or her in person, or by leaving it at the person's usual place of residence. Service of subpoenas is solely the responsibility of the party requesting the subpoena and shall not be assumed by the impartial hearing officer.

(d) Ruling on procedural issues presented at the hearing; and

(e) Arriving at a *written* decision based solely on evidence and testimony presented at the hearing and mailing such decision, by certified mail, to the parties involved and the Ohio department of education, office for exceptional children.

Emphasis added.

It is well settled that IHO's have the authority to manage their cases so as to achieve their orderly and expeditious disposition. See, *Stancourt v. Worthington City School Dist. Bd. Of Ed*, 164 Ohio App 3d 184, 207, 841 N.E.2d 812, 830 (10th Dist 2005); *In re Columbus City School Dist.*, 111 LRP 39466 (SEA Ohio 2011); *In re Green Local School Dist*, 111 LRP 38711 (SEA Ohio 2013), *In re Maple Heights City School Dist*, 114 LRP 25850 (SEA Ohio 2014). Parent blithely ignores that these are quasi-judicial proceedings with subpoenas power, witnesses, disclosures, exhibits, cross-examinations, a written record and written findings of fact and conclusions of law. There are appeals rights to state administrative hearing officers and federal courts which need to have the ability to review the record with some semblance of organization. Having witnesses look at the fifth page of the fourth document in the pile of documents I have provided to you does not facilitate and orderly and expeditious hearing nor does it allow for an appropriate record for review. The IHO finds her requirements reasonable, prudent and in the interests of fairness and judicial economy and within her authority.

54

Parent's position that the decision must be reached *in* hearing is also erroneous.

Parent relies on Ohio Administrative Code Section 3301-51-05(K)(15) which provides:

> (a) The Ohio department of education must ensure that not later than forty-five days after the expiration of the thirty-day period under paragraph (K)(9)(b) of this rule, or the adjusted time periods described in paragraph (K)(9)(c) of this rule:
> (i) A final decision is reached in the hearing; and
> (ii) A copy of the decision is mailed to each of the parties.

"'The object of judicial investigation in the construction of a statute is to ascertain and give effect to the intent of the law-making body which enacted it.'" *State v. Hairston*, 101 Ohio St.3d 308, 2004 Ohio 969, at ¶ 11, *quoting Slingluff v. Weaver* (1902), 66 Ohio St. 621, paragraph one of the syllabus. Here the Ohio Administrative Code Section 3301-51-05(K)(12) clearly requires a written decision as well as the mailing of that decision. It lacks any semblance of reason to construe the statute stating *in* the hearing to mean that the IHO and the parties have to sit and wait for the IHO to announce and write a decision at a hearing in light of the plain reading of the entire code section.

Parent's premise that this IHO must actually hear the evidence regarding 504 claims, retaliation and independent claims of bullying and harassment that have no demonstrated nexus to a violation under IDEA under the woefully misguided view that she must exhaust her administrative remedies is absurd. If an IHO lacks jurisdiction over a claim, the hearing process simply cannot offer any remedy or relief. Exhaustion is only required when a hearing process offers remedy for the harm. See, *SE v. Grant Cty. Bd. Of Educ*, 544 F 3d 633, 642 (6th Cir. 2008). To require a hearing officer to hear days of testimony and only to declare "I have heard your case but I can't offer you a judgment or any remedy" is nonsensical.

55

Parent also argued throughout the proceedings over the fact that the parties were to exchange exhibits at the disclosure conference and that she should not have to provide any paper copies (just allow access or viewing) and that she only has to provide that document inspection on the fifth business day prior to the hearing.   The statute explicitly provides that the IHO is responsible for arranging a disclosure conference *at least* five days prior to the hearing to insure the information to be presented at the hearing is disclosed.  Ohio Administrative Code Section 3301-5105(K)(12).  Parent Counsel and the District Counsel agreed to the Disclosure Conference date based upon their schedules. Moreover, the IHO granted Parent not one but two extensions over the objection of the District to prepare and exchange her exhibits.

## DISTRICT'S MOTIONS FOR SANCTIONS

Parent initiated the debate over whether IHO's have the authority to issue sanctions, including attorney fees, by filing a Motion for Sanctions for Frivolous Conduct on December 6, 2015.  The District then followed suit with two Motions for Sanctions of its own.  One for Parent Counsel's repeated refusal to comply with the IHO's orders, and the other related to Counsel's last minute cancellation of the hearing on January 6, 2016 due to a scheduling conflict.  Parent later withdrew her Motion citing that she now believed that IHO's do not have authority to issue sanctions, although citing no authority for her new position.[10]

The U.S Department of Education has indicated that the authority of hearing officers to have sanctioning authority and to issue attorney's fees is dependent on state

---

[10] Parent was also afforded another opportunity at the commencement of the hearing to provide authority for her changed position, but declined to do so.  Tr. 4-6.

law. *See*, *Letter to Armstrong*, 28 IDELR 303 (OSEP 1997). The Ohio regulations are without any provision that specifically address the IHO's ability to issue sanctions. In *Stancourt, supra*, the Ohio Court of Appeals found that IHO's are entitled to implied powers similar to those of a court, but that the sanctions imposed on a parent in that case were too harsh. The case did not specifically address fees and other costs.

As it relates to attorneys fee, several cases have found IHO's have authority to sanction conduct and include the reimbursement of attorney fees. *See e.g.*, Moubry v. Indep. Sc. District, 32 IDELR 90 at 283 (D. Minn. 2000); *K.S. v. Fremont Unified Sch. Dist.*, 545 F. Supp. 2d 995 (N.D. Cal. 2008). However, in one pre-2004 IDEA amendment case, a New Mexico a review officer ruled that in that State, the IHO did not even have authority to recommend sanctions. *See*, *Las Cruces Pub. Sch.*, 44 IDELR 205, at 1073 (N.M. SEA 2006)

Statutes clearly allow the imposition of attorney's fees by the Court in an IDEA case. 20 U.S.C Section 1415(i)(3) provides:

JURISDICTION OF DISTRICT COURTS; ATTORNEYS' FEES

(A)In general
The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy.

(B)Award of attorneys' fees
(i)In general In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs—
(I) to a prevailing party who is the parent of a child with a disability;
(II) to a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the

attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

(III) to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

See also, Ohio Administrative Code Section 3301-51-05.

At a minimum, it is clear that Parent's counsel was aware for days, perhaps even weeks, that multiple conflicts existed on the morning of January 6th. While several of those conflicts were to be handled by co-counsel in the case, Counsel did not notify either the IHO or opposing counsel until well after subpoenas had been issued, the scheduling of witness and witness preparation had been completed, and plans had been made for substitutes on the eve of the hearing. Compounding the situation is that fact that initially Counsel represented only that he would probably have to leave the hearing at 11:00 am and referred only to that hearing. Counsel did not disclose yet another "previously scheduled *meeting*" at 10:00 am until an order was issued indicating a 10:00 am telephone conference call would be held in place of the hearing. Despite the IHO's request, no evidence or documentation has ever been submitted to substantiate when that "meeting" was scheduled.

As expressed by the District, the lack of professional courtesy to both the IHO and opposing counsel and refusal to comply with the long accepted professional practices of hearing preparation is distressing and profoundly disturbing; especially in light of a other requests for continuances and extensions (disclosure conference and exchange of exhibits), the outright misrepresentation to the IHO and opposing counsel as to existence

58

of an IEE obtained by the Parent five months previously, stalling tactics (attempted stay of rescheduled hearing by appeal of interlocutory orders); unprofessional email commentary to opposing counsel[11], clumping exhibits with inappropriate labeling and lack of binding, and untimely responses (clarification of issues).

IDEA appears, however, to indicate that only courts have the authority to award attorneys' fees. While under Stancourt, and its implied powers, the IHO has the ability to issue other types of sanctions, i.e. disallowance of exhibits, etc., the IHO finds that because of the express provisions providing courts with the authority to impose attorneys fees, by import, she is lacking authority to issue sanctions for attorneys' fees or monetary damages for any harm caused. Such issues can be addressed either under 20 U.S.C. Section 1415(i)(3) if the District is the prevailing party, or under Section 300.517 if Parent is determined to be the prevailing party.[12]

## BURDEN OF PROOF

The party alleging the denial of a free appropriate education or challenging the adequacy of an IEP bears the burden of proof by the preponderance of the evidence.

---

[11] In a January 6, 2016 email copied to the IHO and the Ohio Department of Education counsel opined "Well, Ms. Perrico is simply wrong, yet again. We can address all of her stories when we do get in the record. I guess we all know the saying, you know what happens when you make an assumption. I wonder if there is another saying about what happens when you make many assumptions?"

[12] 34 C.F.R. Section 300.517 states: In any action or proceeding brought under section 615 of the Act, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to--
(i) The prevailing party who is the parent of a child with a disability;
(ii) To a prevailing party who is an SEA or LEA against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or
(iii) To a prevailing SEA or LEA against the attorney of a parent, or against the parent, if the parent's request for a due process hearing or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

*Schaffer v. Weast*, 546 U.S. 49 (2005), *Kings Local School. Dist. Board of Education v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003); *Dong ex. rel. Dong v. Bd. of Education of the Rochester County School*, 197 F.3d 793, 799 (6th Cir. 1999); *Burilovich v. Bd. of Educ.*, 208 F.3d 560 (6th Cir. 2000); *Cordrey v Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990), cert. denied, 499 U.S. 938 (1991); *Elida Local School. Dist. Bd. Of Educ. V. Erkison*, 252 F.Supp.2d 476 (N.D. Ohio 2203).  If the party claiming a denial of FAPE or challenging the adequacy of an IEP fails to meet that burden, then the party is not entitled to relief. *Doe v. Board of Educ.*, 9 F.3d 455, 460-461 (6th Cir. 1993) *cert. denied*, 511 U.S. 1108 (1994); *Doe v Defendant I*, 898 F.2d 1186, 1191 (6th Cir. 1990).

"Burden of proof" has the same meaning as "burden of persuasion." *Schaffer*, 126 S. Ct. at 534. (I)f the evidence is evenly balanced, the party that bears the burden of persuasion must lose." *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 272, 114 S.Ct. 2251 (1994).

## EVALUATION

This District bears the burden to show that its evaluation was appropriate.  Ohio Administrative Code Section 3301-5-06(B) sets forth the requirements for an initial evaluation and provides:

Initial evaluations

(1) General

Each school district of residence must conduct a full and individual initial evaluation, in accordance with this rule, before the initial provision of special education and related services under Part B of the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education

60

Improvement Act of 2004, December 2004 (IDEA) to a child with a disability residing in the school district.

(2) Request for initial evaluation

Consistent with the consent requirements in rule 3301-51-05 of the Administrative Code, either a parent of a child or a public agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.

(3) A school district of residence will, within thirty days of receipt of a request for an evaluation from either a parent of a child or a public agency, either obtain parental consent for an initial evaluation or provide to the parents prior written notice stating that the school district does not suspect a disability and will not be conducting an evaluation. Hereupon receipt of, the District immediately reached out to Parent to obtain consent.

(4) Procedures for initial evaluation

The initial evaluation:

(a) Must be conducted within sixty days of receiving parental consent for the evaluation; and

(b) Must consist of procedures:

(i) To determine if the child is a child with a disability as defined in paragraph (B)(10) of rule 3301-51-01 of the Administrative Code; and

(ii) To determine the educational needs of the child.

After proving notice to the parent describing any evaluation procedures that the school district proposes to conduct, Ohio Administrative Code Section 3301-51-06(E)(2) sets forth the requirements of that evaluation and provides

In conducting the evaluation, the school district must:
(a) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining:
(i) Whether the child is a child with a disability as defined in paragraph (B)(10) of rule 3301-51-01 of the Administrative Code; and
(ii) The content of the child's individualized education program (IEP), including information related to enabling the child to be involved in and progress in the

61

general education curriculum (or for a preschool child to participate in appropriate activities);

(b) Not use any single source of information, such as a single measure or score, as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

(c) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

Ohio Administrative Code Section 3301-51-06(E)(3) further describes the required

parameters of the evaluation:

Each school district must ensure that:

(a) Assessments and other evaluation materials used to assess a child under this rule:

(i) Are selected and administered so as not to be discriminatory on a racial or cultural basis;

(ii) Are provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information about what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer;

(iii) Are used for the purposes for which the assessments or measures are valid and reliable;

(iv) Are administered by trained and knowledgeable personnel; and

(v) Are administered in accordance with any instructions provided by the producer of the assessments.

(b) Assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

(c) Assessments are selected and administered so as best to ensure that if an assessment is administered to a child with impaired sensory, manual, or speaking skills, the assessment results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (unless those skills are the factors that the test purports to measure).

(d) The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities;

62

(e) Assessments of children with disabilities who transfer from one school district to another school district in the same school year are coordinated with those children's prior and subsequent schools, as necessary and as expeditiously as possible, consistent with paragraphs (B)(5)(b) and (B)(6) of this rule, to ensure prompt completion of full evaluations.

(f) In evaluating each child with a disability under paragraphs (E) to (G) of this rule, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.

(g) Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided.

Finally Ohio Administrative Code Section 3301-51-06(F) sets forth additional

requirement for evaluations as well a re-evaluations and provides:

> (1) Review of existing evaluation data As part of an initial evaluation, and as part of any reevaluation under this rule, the evaluation team shall develop an evaluation plan that will provide for the following and be summarized in an evaluation team report:
>
> (a) Review existing evaluation data on the child, including:
>
> (i)   Evaluations and information provided by the parents of the child;
>
> (ii)  Current classroom-based, local, or state assessments, and classroom-based observations;
>
> (iii) Observations by teachers and related services providers;
>
> (iv)  Data about the child's progress in the general curriculum or, for the preschool-age child, data pertaining to the child's growth and development;
>
> (v) Data from previous interventions, including:
>
> (a) Interventions required by rule 3301-35-06 of the Administrative Code; and
>
> (b) For the preschool child, data from early intervention, community or preschool program providers; and
>
> (vi) Any relevant trend data beyond the past twelve months, including the review of current and previous IEPs; and

63

(b) On the basis of that review and input from the child's parents, identify what additional data, if any, are needed to determine:

(i)      Whether the child is a child with a disability, as defined in rule 3301-51-01 of the Administrative Code, and the educational needs of the child; or

(ii)      In case of a reevaluation of a child, whether the child continues to have such a disability, and the educational needs of the child;

(iii)      The present levels of academic achievement and related developmental needs of the child;

(iv)      Whether the child needs special education and related services; or

(v)      In the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(vi)      Whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general education curriculum.

A review of the evidence presented that the District used a variety of assessment tools and strategies, i.e. standard testing – Woodcock Johnson, WIC V, BASC, in classroom observations, review of academic work product, parental information, to gather relevant functional, developments and academic information about KM; that the District did not use any single source of information as the sole criterion for determining whether KM had a disability; and that the District used technically sound instruments to assess the relative cognitive and behavioral factors in addition to physical or developmental factors.  District Ex. 9, 10, 57, 58, Tr. 361-378, 578-598, 952-954, 979-1014, 1016-1026, 1033.

Further the record demonstrates that the assessments or other evaluation materials used to assess KM were selected or administered as to not be discriminatory on a racial or cultural basis; and that they were provided in her native language and in a form to yield accurate information about what she knows and can do academically, developmentally and functionally.  Further the record clearly shows that Ms. Root and the District

64

personnel who administered the assessment were trained and knowledgeable, that the assessment were used for the purposes in which the assessment or measures are valid and reliable and were administered in accordance with any instructions provided by the producer of the assessments. District Ex. 9, District Ex. 44, p. 456, 979-1011, Tr. 934-936.

The record also plainly reveals that the assessment and other evaluation materials included those tailored to assess the specific areas of educational needs and not merely those designed to provide a single general intelligence quotient. The record further unmistakably proves that KM had no impaired sensory manual or speaking skills, so that the assessment results accurately reflected the child's aptitude or achievement level. District Ex. 9, 58.

The District considered information provided by the Parent prior to and during the planning, having her complete the BASC and during the ETR meeting. Tr. 947-949, 952-964, District Ex. 9, 10, 57 and 58.

The record unequivocally shows that KM was assessed in all three areas of suspected disability and that the evaluations was sufficiently comprehensive to identify all of KM's special education and related services needs and that the assessment tools and strategies used provided relevant information that would directly assist persons in determining the educational needs of KM. District Ex. 9, 10, 57, 58. Tr. 587-598, 971, 974-978, 987-988, 1033.

Other than the alleged denial of meaningful input, the Parent almost exclusively relies upon the fact that the District did not obtain diagnostic medical information

themselves and pay for an evaluation relating the KM's alleged diagnoses of TBI, PTSD, anxiety or depression. Parent relies on *Letter to Veir*, 20 IDELR 862 (OCR 1993), *Rodgriguez v. Indepdent Sch. Dist of Boise City*, 63 IDELR 36 (D. Idaho 2014) and *Jana K. v. Anaville Celona Sch. Distr.*, 63 IDELR 278 39 F. Supp3d 584 (M.D.Pa 2014) in support of her assertions. Parent also asserts that the District refused to review information provided by Parent and her counsel at the ETR meeting.

In all of these cases, involved a student already identified under IDEA, or that the District suspected to have or should have known had a disability.  No such circumstances are present here.

Moreover, the District justifiably did not believe any further evaluation was needed in light of its findings that KM, even if she had PTSD, TBI, depression or anxiety was in need of special education services. The offer to review any additional information the Parent may have to refute its findings was requested.  The District is not obligated under IDEA to fund medical evaluation when it does not suspect the child to have a disability.

One of the areas of great concern in this case is the Parent's unwillingness, indeed outright refusal, to share outside provider information with the District or even allow the providers to testify at the hearing. Parent proclaims she does not have to reveal that information.  However, good faith cooperation is essential to the IDEA process.  "Good faith cooperation includes reasonable and timely cooperation with the school authorities. See, *S.M. v. Weast*, 240 F. Supp.2d 426, 436-3 (D.Md. 2003).

66

Notably, several courts have declined to grant relief to parents who conceal information from an IEP team. _See. e.g._. _Robert M. v. Hawaii,_ No. CIV 07-00432 HG-LEK, 2008 WL 5272779 (D. Haw. Dec 19, 2008). "Parents of a student who qualified for services under the IDEA may not withhold critical information from the IEP team, and then claim a FAPE was not provided." Id. Courts frequently hold that parents who refuse to cooperate in a district's effort to formulate an IEP are not entitled to full or partial reimbursement or compensatory education. _Dry Creek Joint Elementary School District,_ 110 LRP 15980 (Feb 8, 2010 Cal. SEA). Where the parents continually rebuffed the school district's efforts to consider all options and create a program for a student and failed to share information and provide necessary data, a California SEA found the student was not entitled to reimbursement for a private placement program. _Riverside Unified School District and Desert Sands Unified School District,_ 106 LRP 49420 (May 5, 2006 Cal. SEA).

In summary, the District's evaluation was appropriate and thus the refusal to provide an IEE at District expense was correct and in full compliance with IDEA.

## ACCESS TO RECORDS

Parent's complaint states that the District failed to produce all requested records in advance of any meeting regarding any potential IEP. Ohio Administrative Code Section 3301-51-04(D) states:

(D) Access rights

(1) Each participating agency must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this rule. The agency must comply with a request without unnecessary delay and before any meeting regarding an individualized education

67

program (IEP), or any hearing pursuant to rule 3301-51-05 of the Administrative Code or resolution session pursuant to rule 3301-51-05 of the Administrative Code, and in no case more than forty-five days after the request has been made.

(2) The right to inspect and review education records under this rule includes:

(a) The right to a response from the participating agency to reasonable requests for explanations and interpretations of the records;

(b) The right to request that the agency provide copies of the records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records; and

(c) The right to have a representative of the parent inspect and review the records.

The District first response is that any failure under OAC is remedied under 34 CFR Section 99.22 and is distinct from a due process hearing. The Hearing Office agrees that the failure to grant access to educational records is subject to the hearing procedure set forth in 34 CFR Section 99.22. See also, OAC Section 3301-51-04. However, that does not end the inquiry.

IDEA states: "The procedures required by this section shall include . . . [a]n opportunity for the parents of a child with a disability to examine *all records relating to such child[.]*" 20 U.S.C. § 1415(b)(1) (emphasis added); *see also* Ohio Administrative Code Section 3301-51-04(A) ("Each school district, county board of mental retardation and developmental disabilities . . . and other educational agency shall adopt and implement written policies and procedures . . . that afford parents the opportunity to examine records in accordance with the procedures of 34 C.F.R. 300.610 to 300.628[.]").

Furthermore, "Each participating agency must permit parents to inspect and review *any education records relating to their children that are collected, maintained, or used by the agency under this part.*" 34 C.F.R. § 300.613(a) (emphasis added).

68

FERPA likewise recognizes a parent's right to inspect education records of any educational institution receiving federal funding:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children.

20 U.S.C. § 1232g(a)(1)(A).

Moreover, "[i]f circumstances effectively prevent the parent . . . from exercising the right to inspect and review the student's education records, the educational agency . . . shall [p]rovide the parent . . . with a copy of the records requested[.]" 34 C.F.R. § 99.10(d)(1). "The educational agency . . . shall respond to reasonable requests for explanations and interpretations of the records." *Id.* § 99.10(c).

The applicable regulations for both IDEA, 34 C.F.R. § 300.613, and FERPA, 34 C.F.R. § 99, define "education records" under 34 C.F.R. § 99. *See also* Ohio Administrative Code 3301-51-04(B)(2) (defining "education records" under 34 C.F.R. § 99 also). Section 99.3(a) of Title 34 of the Code of Federal Regulations defines "education records" as "records that are (1) Directly related to a student; and (2) Maintained by an educational agency or institution or by a party acting or the agency or institution." The section, however, states that "education records" do not include "[r]ecords that are kept in the sole possession of the maker, are used only as a personal memory aid, and are not accessible or revealed to any other person except a temporary substitute for the maker of the record." 34 C.F.R. § 99.3(b)(1).

69

The District alleges that even if the IHO permits the Parent to proceed on the issue of that the Board failed to provide access to records, that she failed to establish this at the hearing. The District points to the fact that the Parent had access to the student's grades, absence and assignment records twenty four hours per day, seven days per week. Parent was afforded the opportunity to review test protocols, but did not do so. Parent's counsel was provided a copy of the student cumulative file within the time frame following the request. What was provided to the Parent's counsel in the days prior to the disclosure conference were mostly copies of emails from the Parent herself,

At first blush, the issue seems to be one of only semantics, i.e. access vs. produce copies. But the statutes themselves clearly evince a distinction. IDEA speaks of a parent's right to "examine" records or to "review" or to "obtain access" to records. Only if circumstances prevent a parent from exercising the right to inspect or review is the educational agency required to provide copies.

The Hearing Officer agrees that the Parent has not established that she was denied access to records. Nowhere in the record is a request that she be granted access to records nor is there a record of the denial to access to those records. What her counsel requested was copies of records - and those were ultimately provided. There is no question that Parent received all documents, and they were provided ultimately weeks in advance of the hearing.[13]

---

[13] Ironically, while the Parent received all records well in advance of the January 26, 2016 initial hearing date, the Parent continued to assert she did not have to produce any of her records until five days prior to the hearing and not one minute before and that she only had to provide access to records and not copies.

More importantly, however, the Parent failed to show any type of harm for the alleged lateness of any production of any records.  Parent has failed to point to even single document that she was not timely provided that impacted on her ability to participate in the ETR planning meeting, the ETR meeting or the due process hearing. Blanket statements that she would have been able to participate more effectively are insufficient to meet her burden.

Moreover, the Sixth Circuit Court of Appeals has held that a procedural violation of IDEA is not per se denial of FAPE, rather a school district's failure to comply with the procedural requirements of the Act will constitute a denial of FAPE only if such violation causes substantive harm to the child or his parents.  Nack v. Orange City Sch. Dist. 454,F 3d 604, 612 (6th Cir. 2006) quoting Knable ex. Rel. Knable v. Bexley City Sch. Dist, 238 F.3d 755, 765 (6th Cir. 2001). 20 U.S.C. Section 1415(f)(3)(E)(ii) provides:

> Procedural issues.  In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—
>
> (I)     impeded the child's right to a free appropriate public education;
> (II)    significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or
> (III)   caused a deprivation of educational benefits.

Here, even if Parent could demonstrate the existence of a procedural violation, she did not even attempt to meet her burden of proof to show that the alleged violation resulted in substantive harm.  Under such circumstances this claim must fail.

71

## CHILD FIND

The District has adopted policies and procedures to ensure that all children with disabilities residing in the District are identified, located and evaluated as required by IDEA.  Tr. 95, 97-99, 678, 941-941.  Parents are correct that bullying, poor attendance, declining grades and implementation of special education interventions may trigger child find duties.  However, academic difficulties, poor attendance and failure to complete work assignments do not always trigger a child find obligation especially when other factors explain a student's failure to progress.  See, *Jefferson Cnty Bd. Of Educ. v. Lolita,* 977 F. Supp 2d 1091, 1124-1125 (N.D. Ala, 2013); *J.S. v. Scarsdale Union Free School District,* 826 F. Supp. 2d, 635, 663 (S.D.N.Y. 2011).

However, having found that the MFE was through and complete and compliant with all statutory requirements, the child find allegations set forth by the Parent are moot and no further review is warranted as KM is not qualified for special education services.

## CONCLUSIONS OF LAW

The Solon City School District fulfilled its child find obligations under Ohio Administrative Code Section 3301-51-03

At no time prior to evaluating KM did the Solon City School District Board of Education have reason to suspect that KM was a student with a disability as defined by Ohio Administrative Code Section 3301-51-01(B)(10).

The Solon City School District's evaluation of KM fully complied with Ohio Administrative Code Section 3301-51-06.

The Solon City School District's ETR fully complied with Ohio Administrative Code Section 3301-51-06.

The refusal of the Solon City School District to publicly fund the Parent's request for an independent educational evaluation was proper under Ohio Administrative Code Section 3301-51-05(G)(2).

KM is not a student with a disability as defined by Ohio Administrative Code Section 3301-51-01(B)(10).

The District provided Parent access to education records as required under Ohio Administrative Code Section 3301-51-04(D).

Parent failed to establish that any failure to receive copies of education records infringed her ability to participate in the ETR planning meeting, ETR meeting or due process hearing.

73

The District is a prevailing party in cases SE 3156-2015 and SE 3168-2105 pursuant to 20 U.S.C. Section 1415(i)(3)(B)(II) and Ohio Administrative Code Section 3301-51-05(K)(18).

IT IS SO ORDERED.

_____
Anne Piero Silagy
Impartial Hearing Officer

74

## NOTICE OF OPPORTUNITY TO APPEAL DECISION OF IMPARTIAL HEARING OFFICER OR BRING CIVIL ACTION TO APPEAL STATE LEVEL DECISION

1.     **Appeal from Decision of the Impartial Hearing Officer**: If you are not satisfied with the findings and decision of the impartial hearing officer, you may appeal the decision, in writing, to the Ohio Department of Education **within 45 days** of receipt of the hearing decision, under Revised Code Section 3323.05(H) and Rule 3301-51-05(K)(14)(b) of the Ohio Administrative Code (*Operating Standards for Ohio Educational Agencies Serving Children with Disabilities*).

To appeal from the decision of the Impartial Hearing Officer, you must file a Notice of Appeal that sets forth the order appealed and the reasons for your appeal.  You must file **both**:

a.   The **original** Notice of Appeal with the Ohio Department of Education:

      Ohio Department of Education
      Office for Exceptional Children
      Procedural Safeguards Section
      25 South Front Street, Mail Stop #202
      Columbus, Ohio 43215-4183

b.   A **copy** of the Notice of Appeal with the other party to the due process hearing.

Upon receipt of your Notice of Appeal, the Ohio Department of Education will appoint a State Level Review Officer to review the decision of the Impartial Hearing Officer following the procedures outlined in Rule 3301-51-05(K)(14)(b)(iii).  At the conclusion of that review, the State Level Review Officer will issue a decision.

2.     **Appeal Right after State Level Review Decision**: If you are not satisfied with the findings and decision of the state level review officer, you have the right to bring a civil action to appeal the decision, in writing, under Revised Code Section 3323.05(H) and Rule 3301-51-05(K)(17). You may file your civil action:

a.  In the court of common pleas of the county in which the child's school district of residence is located within **45 days** of notification of the order of the state level review officer, under Chapter 119, of the Revised Code, as specified in Revised Code Section 3323.05(H), **or**

b.  In a district court of the United States within **90 days** from the date of the decision of the state level review officer, regardless of the amount in controversy, as specified in 20 U.S.C. 1415(i)(2) and 34 C.F.R. 300.516.

### *Filing in Common Pleas Court*

If you bring your civil action in Ohio common pleas court, within **45 days** of notification of the order of the state level review officer, you must file:

1.  A Notice of Appeal setting forth the order appealed from and stating that the SLRO's order is not supported by reliable, probative, and substantial evidence.  If you wish, you may provide detail regarding the grounds for your appeal.

2.  The Notice of Appeal must be filed with **both** the clerk of the court of common pleas and the Ohio Department of Education **within the 45 day timeline**.  The address for the Ohio Department of Education is:

    Ohio Department of Education
    Office for Exceptional Children
    Procedural Safeguards Section
    25 South Front Street, Mail Stop #202
    Columbus, Ohio 43215-4183

3.  You must mail a copy of the notice of appeal to the other party to the due process hearing.

### *Filing in Federal District Court*

If you choose to bring a civil action in the United States district court, **within 90 days from the date of the decision of the SLRO**, you must file your civil action in accordance with the court's requirements.  You should call the clerk for the United States district court to determine that court's filing requirements.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Decision was served by email on this 29th day of April, 2016 and by regular U.S. mail postage prepaid and by federal express to the following on this 29th day of April, 2016:

Bernadette Laughlin
Ohio Department of Education
25 S. Front Street, #2
Columbus, Ohio 43215-4104

Daniel Bache
Roderick, Linton & Belfance
50 South Main Street
10th Floor
Akron, OH  44308

Kathy Perrico
Lisa H. Woloszynek
Walter Haverfield
The Tower at Erieview
1301 E. 9th Street
Suite 3500
Cleveland, Ohio  44114

Anne Piero Silagy
Impartial Hearing Officer

77